**Opinion filed December 20, 2013**



In The

# Eleventh Court of Appeals

_____

## No. 11-13-00182-CV

_____

## IN THE INTEREST OF A.G., J.G., M.F., AND B.F., CHILDREN

**On Appeal from the 50th District Court**

**Knox County, Texas**

**Trial Court Cause No. 9465**

### M E M O R A N D U M   O P I N I O N

This is an appeal from an order terminating the parental rights of the mother and father of M.F. and B.F., whom we refer to in this opinion as "the children."[1] Both parents appeal. In three points of error, the parents challenge the legal and factual sufficiency of the evidence to support termination. We affirm.

---

[1]Although the notice of appeal indicates that Appellants desire to appeal from all portions of the judgment, Appellants' brief addresses issues that relate only to M.F. and B.F. We note that the mother of M.F. and B.F. is also the mother of A.G. and J.G.; however, the trial court did not terminate any parent's rights with respect to A.G. and J.G. Managing conservatorship of A.G. and J.G. was awarded to their father, who is not the father of M.F. and B.F.

## I. *Termination Standards*

The termination of parental rights must be supported by clear and convincing evidence. TEX. FAM. CODE ANN. § 161.001 (West Supp. 2013). To determine if the evidence is legally sufficient in a parental termination case, we review all of the evidence in the light most favorable to the finding and determine whether a rational trier of fact could have formed a firm belief or conviction that its finding was true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). To determine if the evidence is factually sufficient, we give due deference to the finding and determine whether, on the entire record, a factfinder could reasonably form a firm belief or conviction about the truth of the allegations against the parent. *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002). To terminate parental rights, it must be shown by clear and convincing evidence that the parent has committed one of the acts listed in Section 161.001(1)(A)–(T) and that termination is in the best interest of the child. FAM. § 161.001.

With respect to the best interest of a child, no unique set of factors need be proved. *In re C.J.O.*, 325 S.W.3d 261, 266 (Tex. App.—Eastland 2010, pet. denied). But courts may use the non-exhaustive *Holley* factors to shape their analysis. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These include, but are not limited to, (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent. *Id.* Additionally, evidence that proves one or more statutory grounds

for termination may also constitute evidence illustrating that termination is in the child's best interest. *C.J.O.*, 325 S.W.3d at 266.

## II. *Findings as to M.F. and B.F.*

In this case, the trial court found that the parents had committed two of the acts listed in Section 161.001(1)—those found in subsections (D) and (E). Specifically, the trial court found that the parents had placed or allowed the children to remain in conditions or surroundings that endangered the children's physical or emotional well-being and that they had engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the physical or emotional well-being of the children. The trial court also found, pursuant to Section 161.001(2), that termination of the mother's and the father's parental rights would be in the best interest of M.F. and B.F.

## III. *Evidence at Trial*

The record shows that the Department of Family and Protective Services removed nine-month-old B.F. and eight-year-old M.F. from their parents' care after B.F. was hospitalized and diagnosed with "nonaccidental trauma" from being shaken. B.F. was originally taken to the hospital in Knox City, then transferred to a hospital in Abilene, and ultimately transferred to Cook Children's Medical Center in Fort Worth where he remained for one week. Appropriate medical treatment for B.F. was delayed because the parents did not inform medical personnel what had happened to B.F. Not only did the parents fail to assist the hospitals by informing medical personnel what had happened to B.F., the parents allowed a spinal tap to be performed on B.F. to test for meningitis. Medical experts at Cook Children's Medical Center determined that B.F. had been shaken and that his injuries were not consistent with a fall.

During the investigation into B.F.'s injuries, the parents, at times, claimed that B.F. had hit his head when the father accidentally dropped him. At other

times, the parents suggested that a babysitter was to blame for B.F.'s injuries; however, the record shows that the parents were the only adults around B.F. near the time—as determined by medical personnel—that the injury occurred. The father also indicated that he did not know what happened to B.F. The father, at one time, indicated that he knew that someone in his house injured B.F., but he said that he did not do it and stated, "I guess that would leave [the mother]." The father changed his story numerous times and was so "overwhelming[ly] deceptive" that the polygraph examiner refused to continue with the exam. The mother was also "deceptive" and failed a polygraph.

At the hearing, the father invoked his Fifth Amendment privilege and refused to answer numerous questions that involved the circumstances surrounding B.F.'s injuries and hospitalization. The father's attorney informed the trial court that the father "has been under investigation continuously since last year by the Texas Rangers in regards to the injuries to [B.F.]."

The mother testified that, on the night B.F. was hospitalized, B.F. "woke up screaming" and then "started to projectile vomit." The parents took B.F. to the emergency room. The mother claimed that she heard a crash coming from the kitchen and that B.F. had hit his head while he was in the kitchen with the father. The mother also said that she and the father "did not tell any of the hospitals that [B.F.] had hit his head" because they "were afraid of CPS coming in like they had before and jumping to conclusions without getting the facts and then taking the kids away from us again."

Testimony at trial indicated that the parents were under a considerable amount of stress at the time B.F. was injured. Evidence also showed a history of domestic violence in the household. Two witnesses familiar with the family testified that the father was physically abusive toward the mother. In addition to evidence of physical abuse perpetrated by the father, evidence was also introduced

4

showing that the mother, while holding B.F. and a butcher knife, said to the father, "[I]f you don't get this [their vehicle] fixed, I'll kill every one of these kids, starting with the youngest to the oldest." A.G. heard the mother's threat and ran into the food pantry crying. A licensed professional counselor testified that domestic violence in the home significantly affects children and is devastating to their well-being.

Texas Ranger Corey Lain investigated B.F.'s injuries. Ranger Lain testified that, about a year prior to the commencement of this case, the father had contacted Ranger Lain and requested that he investigate a situation involving the Knox City police department. According to Ranger Lain, the father complained that the "police department was on some type of campaign against him and his family and was siding with another family and allowing masked men to break their windows and throw trash on their yards so that the police could write him Class C tickets for littering violations."

The mother had similar thoughts with respect to the Department and the school being against her family. On the day that B.F. was injured, the mother received a call from the school about A.G.'s notebook, which contained some concerning drawings. The mother, who "thought that the school was against the kids, especially [A.G.]," was furious with the school and, without even seeing the notebook, asserted "that that wasn't [A.G.'s] handwriting, that it was Joseph's." The mother withdrew A.G., J.G., and M.F. from school that day.

In an incident that occurred at the courthouse after a hearing was postponed, the mother "took off" down the hallway, upset that she could not speak to the judge or the Department's attorney. The father stayed behind and talked to the caseworker about obtaining the required services. The mother returned and became enraged when she saw the father and the caseworker talking. The mother screamed at the father "all the way down the hallway": "Don't talk to them, . . . .

Get away from them." The caseworker testified that the mother's behavior that day was "quite irrational" and frightening.

Ranger Lain believed that the children's safety would be directly threatened and that they would be in jeopardy if they were returned to the parents. The Department's caseworker also testified that she would be concerned for the children's emotional and physical safety if the children were returned to their parents. The caseworker also explained why parental termination was appropriate with respect to B.F. and M.F. but was not necessary with respect to A.G. and J.G. M.F. and B.F. have remained with the same foster family since this case began, which was one year and four months prior to the final hearing.

The foster parents have provided the children with a good, safe, and stable home. They have developed a close bond with the children and would like to adopt both of them. The foster mother testified that M.F. likes living with them but that M.F. misses her mother and would like to go home. The children's ad litem informed the court that M.F. is apathetic: she misses her mother and wants to go home, but she said it would be perfectly okay to stay with the foster parents too. The foster mother thought that it would be in both children's best interest to remain with the foster parents. She believed that M.F. would adjust and that M.F. needed stability. As for B.F., the foster mother testified that B.F. had been released from the neurosurgeon, that B.F. knows the foster parents as his parents, and that B.F. and the foster father have an extremely close relationship. The caseworker testified that termination would be in M.F.'s and B.F.'s best interest.

The record reflects that the parents participated in the court-ordered services and that they visited the children regularly. Their visits were always appropriate, though sometimes emotional.

## IV. *Analysis*

After reviewing the entire record, we hold that the evidence is sufficient to support termination of both parents' rights. We note first that a trier of fact in a civil case is free to draw negative inferences from a witness's repeated invocations of the Fifth Amendment. *Wilz v. Flournoy*, 228 S.W.3d 674, 677 (Tex. 2007); *see* TEX. R. EVID. 513(c). In this case, the father invoked his Fifth Amendment privilege when asked numerous questions about the events surrounding B.F.'s injuries, for which criminal charges are still pending.

The evidence is legally and factually sufficient to support the trial court's finding under Section 161.001(1)(E). There was clear and convincing evidence from which the trial court could reasonably have formed a firm belief that the parents engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the physical or emotional well-being of the children. The evidence indicates that B.F. was severely injured by one of his parents. The parents, however, covered for each other, attempted to blame a babysitter, and failed to inform medical personnel what happened to B.F., which delayed proper treatment. There was also evidence of domestic violence between the parents and a bizarre act involving the mother and a butcher knife. Such acts constituted conduct that endangered the children. To support termination under Section 161.001(1)(E), the offending conduct does not need to be directed at the child, nor does the child actually have to suffer an injury. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). Furthermore, domestic violence may constitute evidence of endangerment. *Id.*; *In re C.J.O.*, 325 S.W.3d 261, 265 (Tex. App.—Eastland 2010, pet. denied). The parents' third point is overruled.

Because a finding that a parent committed one of the acts listed in Section 161.001(1)(A)–(T) is all that is required under that statute, we need not address the parents' second point in which they challenge the sufficiency of the evidence to

support the trial court's finding under Section 161.001(1)(D). *See* TEX. R. APP. P. 47.1.

We also hold that, based on the evidence presented at trial and the *Holley* factors, the trial court could reasonably have formed a firm belief or conviction that termination of the parents' parental rights would be in the best interest of the children. *See Holley*, 544 S.W.2d at 371–72. Upon considering the record as it relates to the desires of the children, the emotional and physical needs of the children now and in the future, the emotional and physical danger to the children now and in the future, the parental abilities of the parents and the foster parents, the nature of the injury to B.F., the circumstances surrounding that injury, the conduct of the parents with respect to B.F.'s injury, the plans for the children by the Department, the stability of the children's current placement, and the foster parents' desire to adopt both children, we hold that the evidence is both legally and factually sufficient to support the findings that termination of the mother's and the father's parental rights is in the best interest of the children. *See id.* We hold that the findings as to the best interest of M.F. and B.F. are supported by clear and convincing evidence. The parents' first point is overruled.

## V. *This Court's Ruling*

We affirm the trial court's order.

MIKE WILLSON

JUSTICE

December 20, 2013

Panel consists of: Wright, C.J.,
Willson, J., and Bailey, J.

8